IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| YVONNE M. WEST, individually and as Administrator of the Estate of Jamon West, <br><br> Plaintiff, <br><br> v. <br><br> DEKALB COUNTY, GEORGIA; CAPT. PHILLIP DITMORE; SFF. DAVID KELLY; SFF. JASON WINKLER; SFF. KEVIN FLEMING; FF. JONAH LAKATOS; FF. TIFFANY PAYNE; DO MELISSA VAN WIE; SGT. M. WILLIAMS; OFF. TIMOTHY LATTIMORE; OFF. BRANDON W. WILLIAMS; OFF. DEION PAXTON; OFF. C. JONES; and OFF. JOSHUA BURTON, <br><br> Defendants. | CIVIL ACTION <br><br> FILE NO. 1:23-CV-01907-LMM |

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANTS PHILLIP DITMORE, DAVID KELLY, TIFFANY PAYNE, MELISSA VAN WIE, AND JASON WINKLER**

Plaintiff Yvonne M. West hereby opposes the Motion to Dismiss filed by Defendants Phillip Ditmore, David Kelly, Tiffany Payne, Melissa Van Wie, and Jason Winkler (the "DeKalb County Fire Rescue Defendants" or "DCFR Defendants"). As demonstrated below, the DCFR Defendants' Motion is due to be denied because the allegations of Plaintiff's Amended Complaint, construed under

the applicable legal standard, set forth factually plausible and legally viable claims against each of the DCFR Defendants.

## I.   Relevant Background

### A.   Procedural History

Plaintiff filed her Complaint in the United States District Court for the Northern District of Georgia on April 26, 2023. (Doc. 1.)

On June 26, 2023, Defendants filed two Motions to Dismiss: one on behalf of Defendants DeKalb County, Jones, and Paxton (Doc. 21), and one on behalf of Defendants Ditmore and Payne (Doc. 23).

In response to the first round of Motions to Dismiss, Plaintiff filed an Amended Complaint on July 17, 2023. (Doc. 28.) That filing mooted Defendants' then-pending Motions to Dismiss, as acknowledged in this Court's Order dated July 18, 2023. (Doc. 29.)

On July 31, 2023, Defendants filed a second round of Motions to Dismiss: one on behalf of Defendants DeKalb County, C. Jones, Timothy Lattimore, Deion Paxton, and M. Williams (Doc. 41); and one on behalf of the DCFR Defendants (Doc. 43). The DCFR Defendants' Motion to Dismiss addresses Counts IV (Excessive Force), V (Deliberate Indifference to Medical Needs), VI (Failure to Intervene), and VII (Attorneys' Fees and Expenses of Litigation) of the Amended Complaint.

## B.      Factual allegations

The lawsuit concerns an incident that occurred at Plaintiff's home in DeKalb County, Georgia. Doc. 28, ¶ 18. On August 16, 2019, Plaintiff's adult son, Jamon West, had an episode of what is known as "excited delirium" as a result of a seizure disorder. *Id.*, ¶ 19. The symptoms of excited delirium include extreme agitation, hyperactivity, hyperthermia, confusion, and disregard of pain. *Id.*, ¶ 20. Because neither Mr. West nor his mother could control his symptoms, Ms. West called DeKalb County 9-1-1 and reported that her son was having a seizure and that she could not control him. *Id.*, ¶¶ 21-22.

It is well known in the law-enforcement and medical communities that some methods of physical restraint create a heightened risk of asphyxia and cardiac arrhythmia in a patient with excited delirium. *Id.*, ¶ 25. Guidance from the United States Department of Justice has advised law-enforcement agencies since 1995 that this life-threatening risk is heightened when a person engages in physical struggle and then is restrained in a prone position with hands cuffed behind the back. *Id.*, ¶ 26, 66. For this reason, as a means of preventing death in custody, DCFR policy expressly prohibits prone restraint of persons with excited delirium, and permits only soft medical restraints to be used on such patients. *Id.*, ¶ 68, 71.

The Amended Complaint alleges that all of the DCFR Defendants ignored this requirement. DCFR officers Winkler and Lakatos were the first to arrive at the

3

scene. *Id.*, ¶¶ 24. They observed the telltale symptoms of excited delirium, but they made the initial decision to restrain Mr. West in a prone position, face down on the ground. *Id.*, ¶¶ 24, 28. DCFR Defendants Ditmore, Kelly, Van Wie, and Fleming arrived and assisted in restraining Mr. West in a prone position, with four or five firefighters applying force to all four extremities and to his back. *Id.*, ¶¶ 29-30.

Ms. West asked the officers to stop restraining him in this way because he could not breathe, but they ignored her. *Id.*, ¶¶ 31-33. She told all of the officers that Mr. West's abnormal behavior was the result of a medical condition for which he took prescription medications. *Id.*, ¶ 87. In addition, all of the officers could see for themselves that Mr. West exhibited the classic symptoms of excited delirium, including extreme agitation, hyperactivity, hyperthermia, confusion, and disregard of pain. *Id.*, ¶¶ 20, 90-91.

DCFR Defendants Ditmore and Payne then gave Mr. West an intramuscular injection of the maximum permitted dose of two sedative medications, Haldol and Versed. *Id.*, ¶¶ 34-35. Both of these medications are central nervous system depressants that carry the known risk of reducing a patient's ability to breathe, and Defendants Ditmore and Payne were aware of that side effect. *Id.*, ¶¶ 37-38, 92-93, 134. Yet, after administering these medications, the DCFR Defendants kept Mr. West in a prone position. *Id.*, ¶¶ 76, 134-137. In fact, when DeKalb County police officers arrived on the scene, Defendant Ditmore directed them to place Mr. West

in handcuffs and assisted them in cuffing his hands behind his back. *Id.*, ¶¶ 39-42.

Neither he nor Defendant Payne instructed the other officers to do anything to

mitigate the risk of cardiorespiratory arrest. *Id.*, ¶¶ 136-37. To the contrary,

Captain Ditmore left Mr. West restrained in a prone position, face down on the

ground with hands cuffed behind his back, while Ditmore walked off and made a

radio call. *Id.*, ¶¶ 43-45. The officers continued to restrain Mr. West in a prone

position until after the intramuscular injections had taken effect and Captain

Ditmore had returned from making his call. *Id.*, ¶¶ 50-51.

Ditmore ordered the handcuffs replaced with soft restraints, and the officers

began transporting Mr. West across the yard. *Id.*, ¶¶ 52-53. Mr. West's respiratory

rate dropped and he went into cardiac arrest. *Id.*, ¶ 53. After spending several days

in a coma, Mr. West died on August 25, 2019. *Id.*, ¶ 54. The DeKalb County

Medical Examiner determined after an autopsy that Mr. West died of "[d]elayed

complications of cardiorespiratory arrest due [to] probable excited delirium and

physical restraint," and that the manner of death was "homicide." *Id.*, ¶¶ 55-56.

### C.   Plaintiff's claims against the DCFR Defendants

Counts I through III of the Amended Complaint assert claims against

DeKalb County. These counts are not challenged by the DCFR Defendants and

will be addressed in Plaintiff's response to DeKalb County's Motion to Dismiss.

Count IV of the Amended Complaint alleges that Defendants Ditmore, Lakatos, Winkler, Kelly, Van Wie, Fleming, Lattimore, and Williams participated in the use of excessive force against Plaintiff's decedent Jamon West, in that they improperly restrained him in a prone position with his hands cuffed behind his back and with pressure on his back. *Id.*, ¶¶ 113-15. Plaintiff alleges that this method of restraint, under the circumstances, constituted deadly force because it created a significant risk of death or serious bodily harm. *Id.*, ¶ 116-17.

Plaintiff alleges that the DCFR Defendants knew that prone restraint of Mr. West, created a significant risk of death or serious bodily injury, because, among other things, DCFR policy expressly forbade prone restraint in these circumstances and required the DCFR Defendants to roll Mr. West onto his side or place him in a seated position so that he could breathe properly. *Id.*, ¶¶ 68, 122. These preventive measures were safe and feasible, but Defendants failed to employ them. *Id.*, ¶¶ 118-22. Instead, they continued to apply deadly force to Mr. West after any possible justification for such force had ceased. *Id.*, ¶¶ 124-26.

Count V of the Amended Complaint alleges that Captain Ditmore and Defendant Payne acted with deliberate indifference to Mr. West's medical needs. *Id.*, ¶¶ 128-39. Plaintiff alleges that these Defendants knew Mr. West was suffering from excited delirium, and that this condition placed him at an increased risk of cardiorespiratory arrest. *Id.*, ¶¶ 130-31. They also knew Mr. West had an increased

need for oxygen due to both his excited delirium and the fact that he had just been

involved in extreme physical exertion. *Id.*, ¶ 132. They knew that he had been

restrained in a prone position with force applied to his back, which would make it

harder for him to breathe. *Id.*, ¶ 133, 135. Further, they gave Mr. West medications

that they knew could further compromise his ability to breathe. *Id.*, ¶ 134. Yet

despite all this knowledge, they took no steps to ensure that their patient was

restrained in a manner that facilitated proper breathing. *Id.*, ¶¶ 136-37. Captain

Ditmore, in particular, was the commanding officer at the scene but failed to give

appropriate orders to ensure that Mr. West was permitted adequate oxygen. *Id.*, ¶¶

128, 136. As a result, Mr. West died of cardiorespiratory arrest. *Id.*, ¶ 138.

Count VI of the Amended Complaint addresses the fact that all of the

Defendants were at the scene and witnessed the improper restraint of Mr. West, but

none of them intervened to cause that restraint to be modified so that he could

obtain adequate oxygen. *Id.*, ¶¶ 140-44. Finally, Count VII contains a claim for

attorneys' fees and expenses of litigation against the individual Defendants

pursuant to 42 U.S.C. § 1988. *Id.*, ¶¶. 145-46.

## II.    Argument and Citation to Authority

The DCFR Defendants make three arguments for dismissal of the claims

against them. First, they contend that Plaintiff has asserted official-capacity claims

against them, and that these unidentified claims are redundant of her claims against

DeKalb County. Second, they contend that Ms. West has asserted claims against them that belong solely to her, and are not asserted on Mr. West's behalf, and that these unidentified claims are barred by the statute of limitations. (Defendants do not argue that any claims brought on behalf of Mr. West are untimely.) And third, they contend that they are entitled to qualified immunity as to Counts IV, V, and VI of the Amended Complaint. As demonstrated below, these arguments fail, and the DCFR Defendants' Motion should be denied in full.

> **A.   A Motion to Dismiss under Rule 12(b)(6) cannot be granted where the allegations, taken as true and construed in favor of the non-moving party, give notice of a legally viable and factually plausible claim.**

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court should assume the veracity of all well-pleaded factual allegations and then determine whether they plausibly give rise to entitlement to relief. *Id.* A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts must view the complaint in the light most favorable to the plaintiff and resolve any doubts as to its

sufficiency in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (*per curiam*).

> **B.    Plaintiff does not assert separate official-capacity claims against individual defendants under Section 1983.**

The DCFR Defendants' first argument is really more a point of clarification. They note that a Section 1983 claim against a public official in his or her official capacity is deemed to be equivalent to a claim against the relevant governmental entity. Doc. 43-1, pp. 6-7 (citing *Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir. 1989)). That is quite correct. To be clear, Plaintiff asserts Counts IV, V, and VI of the Amended Complaint against the DCFR Defendants individually, and not in their official capacities.

The reason why the caption of the pleading states that the individual DCFR Defendants are sued in both their official and individual capacities is that Count II of the Amended Complaint alleges liability under the Americans with Disabilities Act for official decisions that Captain Ditmore made, and the officers under his command executed, on behalf of DeKalb County. Doc. 28, ¶¶ 83-104; *cf. Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 350, 23 Fla. L. Weekly Fed. C 1668 (11th Cir. 2012) (holding that a public entity may be liable under Title II of the ADA for the act of an official whom it vests with discretion to decide whether to provide an accommodation for a person's disability). Because "there is no individual capacity liability under Title II of the ADA," *Badillo v. Thorpe*, 158 F.

App'x 208, 211 (11th Cir. 2005), Plaintiff asserts her ADA claims against DeKalb County for decisions made by its employees in their official capacities.

### C.   None of Plaintiff's claims are barred by the statute of limitations.

Because the Civil Rights Act does not provide a limitations period for claims arising under Section 1983, federal courts are directed to "borrow" an appropriate period from state law pursuant to 42 U.S.C. § 1988(a). *Wilson v. Garcia*, 471 U.S. 261, 279-280 (1985). Supreme Court precedent also dictates that the limitations period to be borrowed is "that which the State provides for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 387, 127 S. Ct. 1091, 1094, 166 L.Ed.2d 973, 980 (2007); see also *Owens v. Okure*, 488 U.S. 235, 249-250, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989); *Wilson v. Garcia*, 471 U.S. 261, 279-280 (1985). Thus, the Eleventh Circuit has held that "the proper limitations period for all section 1983 claims in Georgia is the two year period set forth in O.C.G.A. § 9-3-33 for personal injuries." *Williams v. City of Atlanta*, 794 F.2d 624, 626 (11th Cir. 1986); *see also Johnson v. Bd. of Regents*, No. 5:06-cv-366 (WLS), 2007 U.S. Dist. LEXIS 71983, at *6 (M.D. Ga. Sep. 27, 2007) (applying two-year Georgia personal injury statute to federal disability claims under Section 504 of the Rehabilitation Act).

Along with the limitations period, federal law also borrows state law on "closely related questions of tolling and application" of that period. *Wilson*, 471 U.S. at 269; *Bd. of Regents of Univ. of N.Y. v. Tomanio*, 446 U.S. 478, 484-86, 100

S. Ct. 1790, 64 L. Ed. 2d 440 (1980). District courts in Georgia have borrowed and

applied the tolling rule contained in O.C.G.A. § 9-3-99. *Shaw v. Peach Cty.*, No.

5:21-cv-00145-TES, 2021 U.S. Dist. LEXIS 175088, at *17 (M.D. Ga. Sep. 15,

2021); *Benjamin v. Thomas*, No. 1:16-cv-1632-WSD, 2016 U.S. Dist. LEXIS

132575, at *18 (N.D. Ga. Sep. 27, 2016). That rule provides, in relevant part, that

> [t]he running of the period of limitations with respect to any cause of action
> in tort that may be brought by the victim of an alleged crime which arises
> out of the facts and circumstances relating to the commission of such alleged
> crime committed in this state shall be tolled from the date of the commission
> of the alleged crime or the act giving rise to such action in tort until the
> prosecution of such crime or act has become final or otherwise terminated,
> provided that such time does not exceed six years . . ..

O.C.G.A. § 9-3-99. Here, each count of the Amended Complaint "arises out of the

facts and circumstances relating to the commission of [an] alleged crime," namely

an alleged homicide. Doc. 28, ¶¶ 15, 56. DeKalb County District Attorney Sherry

Boston terminated prosecution on April 28, 2021, when she sent letters to DKPD

and DCFR stating that she would not press charges against any of the Defendant

officers. *Id.* This action was commenced within two years of that date. *Id.*

The DCFR Defendants do not dispute these facts, nor do they point to any

specific counts of the Amended Complaint that they contend were not tolled by

O.C.G.A. § 9-3-99. Their argument, instead, is that this statute does not toll certain

unidentified "wrongful death claims." And their only authority for that proposition

is the Georgia Court of Appeals' decision in *Hicks v. Universal Health Servs.*, 364

Ga. App. 769 (2022). But that decision is inapposite here, because it depends on idiosyncratic features of a Georgia cause of action that Plaintiff does not assert.

The *Hicks* decision turned on the fact that a Georgia wrongful-death claim arises in favor of certain statutory beneficiaries upon the death of an injured party. As the Georgia Court of Appeals held in *Hicks*:

> [Georgia] case law is clear that despite any commonality in the damages sought, the [wrongful-death] cause of action itself belongs to the surviving parent [or other statutory beneficiary], not the victim. Therefore, the Survivor claims are not 'cause[s] of action in tort that may be brought by the victim of an alleged crime' [as required by O.C.G.A. § 9-3-99].

*Hicks*, 364 Ga. App. at 776. Following this reasoning, the court held that O.C.G.A. § 9-3-99 does not toll a Georgia wrongful-death claim because that state-law claim "is, by definition, not a claim 'that may be brought by' the decedent." *Id.*

Unlike a Georgia wrongful-death claim, Plaintiff's claims under the ADA and Section 1983 belonged to Mr. West during his lifetime. Such claims proceed from causes of action in tort "that may be brought by the victim of an alleged crime which arises out of the facts and circumstances relating to the commission of such alleged crime," within the meaning of O.C.G.A. § 9-3-99. Defendants do not identify any cause of action asserted here that Mr. West could not have brought himself, if he had lived. Nor do they contend that Mr. West's death gave rise to some new federal cause of action comparable to the state-law cause of action for wrongful death in *Hicks*. In contrast to a Georgia wrongful-death claim, the fact of

Mr. West's death is not an element of any of the federal causes of action asserted in the Amended Complaint. Defendants' reliance on *Hicks* is therefore misplaced.

Defendants' argument would apply two different statutes of limitations to the same federal claims in the same case, depending on the damages sought or the capacity in which the claims are made. But as the Supreme Court has specifically held, that is not how federal borrowing of state limitations periods works.

> If the choice of the statute of limitations were to depend upon the particular facts or the precise legal theory of each claim, counsel could almost always argue, with considerable force, that two or more periods of limitations should apply to each § 1983 claim. Moreover, under such an approach different statutes of limitations would be applied to the various § 1983 claims arising in the same State, and multiple periods of limitations would often apply to the same case.

*Wilson*, 471 U.S. at 273-74, 105 S. Ct. at 1945-46. Rather than adopt such a complex regime, the Supreme Court held that Section 1988 "is fairly construed as a directive to select, in each State, the one most appropriate statute of limitations for all § 1983 claims." *Id.*, 471 U.S. at 275, 105 S. Ct. at 1947. In Georgia, that is the statute of limitations for personal-injury claims. *Williams*, 794 F.2d at 626. And Defendants do not dispute that O.C.G.A. § 9-3-99 tolls personal-injury claims.

The fact that this Court must borrow a limitations period from state law does not somehow convert Plaintiff's federal claims into state-law claims for wrongful death. The Supreme Court has explained that the borrowing provision of Section 1988 does not "authorize the federal courts to borrow entire causes of action from

state law." *Moor v. Cty. of Alameda*, 411 U.S. 693, 702, 93 S. Ct. 1785, 1792, 36 L.Ed.2d 596, 605 (1973). The cause of action created by Section 1983 is a federal one, separate and distinct from any state-law remedies. *Monroe v. Pape*, 365 U.S. 167, 183, 81 S. Ct. 473, 482, 5 L.Ed.2d 492, 503 (1961). As the Supreme Court held in *Wilson*, "Congress surely did not intend to assign to state courts and legislatures a conclusive role in the formative function of defining and characterizing the essential elements of a federal cause of action." *Wilson*, 471 U.S. at 269. Defendants' effort to characterize Plaintiff's federal causes of action as Georgia wrongful-death claims ignores this clear and binding precedent.

The reason why Plaintiff has sued in both her capacity as Mr. West's mother and her capacity as the administrator of his estate is simply that Eleventh Circuit precedent gives her standing to sue in both capacities. In *Brazier v. Cherry*, 293 F.2d 401, 403-04 (5th Cir. 1961), the former Fifth Circuit held that the widow of a man beaten to death by Georgia police officers had standing to bring Section 1983 claims for violations of his constitutional rights, both because she was the statutory wrongful-death beneficiary under Georgia law and because she was administratrix of his estate. *See also Carringer v. Rodgers*, 331 F.3d 844, 847-848 (2003) (same, as to Section 1983 claims asserted by mother of deceased son). But the Eleventh Circuit has made clear that the "incorporation of Georgia's wrongful death statute [in *Brazier*] was not done in response to a violation of the [survivor's] rights: it

was done to remedy the violation of the *decedent's* rights." *Robertson v. Hecksel*, 420 F.3d 1254, 1261, 18 Fla. L. Weekly Fed. C 842 (11th Cir. 2005); *cf.* 42 U.S.C. § 1983 (providing that a person who violates federal rights under color of state law "shall be liable **to the party injured**") (emphasis added). So too here, Ms. West brings federal statutory claims to remedy violations of Mr. West's federal rights, for which he could have sued in his lifetime. The fact that certain aspects of these federal claims are borrowed from state law does not convert any of her causes of action into Georgia wrongful-death claims. *Hicks* is therefore inapplicable here.

### D. Defendants are not entitled to qualified immunity.

#### 1. Excessive Force and Failure to Intervene

Plaintiff's claim for excessive force is based on her allegations that the use of prone restraint in combination with behind-the-back handcuffing, under the circumstances, was excessive and constituted deadly force, in that the officers knew that it exposed Jamon West to a significant risk of death or serious bodily injury. Doc. 28, ¶¶ 116-17. *See Pruitt v. City of Montgomery, Ala.*, 771 F.2d 1475, 1479 n.10 (11th Cir. 1985) (defining deadly force as force that an officer "knows to create a substantial risk of causing death or serious bodily harm"). Plaintiff alleges that there was no need for these potentially deadly methods of restraint; that other, safer means were feasible and would not have involved any significant risk to the officers or anyone else; and that Defendants continued to apply these

potentially deadly methods of restraint after any possible justification for them had ceased. Doc. 28, ¶¶ 119-121, 124.

Plaintiff further alleges that Mr. West had a clearly established right to be free from deadly force because he was known to be unarmed; was not suspected of any crime; was not attempting to flee; and was capable of being restrained safely without the need to cuff him behind the back and hold him in a prone position. *Id.*, ¶ 126. "Because this situation was clearly not a deadly force situation, and because the officers utilized deadly force to subdue [Mr. West], they violated the clearly established principle that deadly force cannot be used in non-deadly situations." *Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005).

Defendants appear to argue that prone restraint is reasonable as a matter of law whenever a detainee struggles with officers. But the Supreme Court expressly rejected that argument in its 2021 decision in *Lombardo* v. *City of St. Louis*, 141 S. Ct. 2239, 210 L.Ed.2d 609 (2021). Defendants' entire approach to the excessive-force analysis disregards the Supreme Court's clear instruction in *Lombardo* that a court must not judge the issue "mechanically," but must pay "careful attention to the facts and circumstances of each particular case." *Lombardo*, 141 S. Ct. at 2241, 210 L.Ed.2d at 612 (2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015), and *Graham* v. *Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

As outlined in *Lombardo*, relevant facts and circumstances may include the failure to follow departmental policies designed to mitigate the risk of death from prone restraint, as well as "well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of that risk." *Id.*, 141 S. Ct. at 2241, 210 L.Ed.2d at 612. The Eleventh Circuit has relied on *Lombardo* for the rule that, "when deciding whether to grant summary judgment on an excessive force claim, relevant facts include departmental instructions and other well-known police guidance." *Bradley v. Benton*, 10 F.4th 1232, 1241, 29 Fla. L. Weekly Fed. C 282 (11th Cir. 2021).

Plaintiff's Amended Complaint specifically alleges "well-known police guidance" of the kind cited in *Lombardo* and *Bradley*. *See* Doc. 28, ¶ 26 ("In 1995, the United States Department of Justice stated in written guidance to law-enforcement agencies that 'the risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind-the-back handcuffing combined with placing the subject in a stomach-down position.'"); ¶ Plaintiff alleges that "[i]t is well known that prone restraint of persons with excited delirium creates an increased risk of positional asphyxia and cardiac arrythmia, especially when the subject's hands are cuffed behind the back." *Id.*, ¶ 66. Under *Lombardo* and *Bradley*, these allegations create a reasonable

inference that the law-enforcement officers involved in Mr. West's restraint were aware that they were subjecting him to an unreasonable risk of death.

In fact, Plaintiff's Amended Complaint alleges that the DCFR Defendants were governed by written policies regarding restraint of adults with excited delirium which permitted only the use of soft medical restraints and expressly stated, in bold red type, **"The patient should never be oriented in a prone position."** Doc. 28, ¶¶ 68, 71. The purpose of these policies was to prevent inflicting an unnecessary risk of death in custody. *Id.*, ¶¶ 67, 70. These allegations support Plaintiff's allegation that all of the DCFR Defendants — including Captain Ditmore, Senior Firefighters Winkler and Lakatos, and Firefighters Kelly and Van Wie, all of whom are named in the Excessive Force count — had actual knowledge that it was necessary to avoid prone restraint; to cuff Mr. West in the front rather than behind the back; and to place him in a sitting or side-lying position after he was cuffed. *Id.*, ¶¶ 97, 99.

The Supreme Court's 2021 admonishment in *Lombardo* that lower courts must pay "careful attention to the facts and circumstances of each particular case" — particularly including applicable policies and well-known police guidance, *Lombardo*, 141 S. Ct. at 2241, 210 L.Ed.2d at 612 — renders inapposite the older cases relied upon by Defendants. For example, the Eleventh Circuit's unpublished decision in *Callwood v. Jones*, 727 F. App'x 552, 561 (11th Cir. 2018), did not

involve allegations that officers used a deadly method of restraint that was expressly prohibited by official policy and by widespread police guidance at the time they used it.[1] Accordingly, the *Callwood* opinion does not discuss these factors, which the Supreme Court identified as pertinent in *Lombardo.*

The Eleventh Circuit's 1996 decision in *Cottrell v. Caldwell*, 85 F.3d 1480, 9 Fla. L. Weekly Fed. C 1153 (11th Cir. 1996), involved police conduct that occurred in 1990, a full five years before the United States Department of Justice published its 1995 guidance to law-enforcement agencies concerning the risk of death from prone restraint. 85 F.3d 1480, 1488; *cf.* Doc. 28, ¶ 26 (describing the 1995 DOJ guidance). The plaintiff in *Cottrell* provided an expert affidavit stating that "'it was well known by police on the day of Mr. Wilson's death improper restraint of arrested persons, particularly those on medication and/or who have engaged in strenuous activity, could quickly cause death by asphyxiation'"; but there were no facts to show that this general knowledge was in the subjective possession of the officers involved. 85 F.3d 1480, 1491. The facts are different here. At the time of the 2019 incident involving Mr. West, the 1995 DOJ guidance had been in force for nearly a quarter of a century, and DeKalb County and other jurisdictions had incorporated it into specific policies prohibiting the conduct

---

[1]     The police conduct at issue in *Callwood* took place in 2013. *Callwood v. Phenix City*, Civil Action No. 2:15CV182-WHA, 2016 U.S. Dist. LEXIS 156115, at *4 (M.D. Ala. Nov. 10, 2016).

alleged here. In this factual context, it cannot be assumed at the pleading stage that DeKalb County's firefighters and police were unaware of the well-publicized risks of prone restraint. Further, the fact that DCFR had a written policy expressly forbidding prone restraint of a subject with excited delirium in order to reduce the risk of death, Doc. 28, ¶¶ 67-68, at least raises the inference that Defendants knew such restraint would create a heightened risk of death. *Benton*, 10 F.4th 1232, 1241 (jury could find that officer knew of risk of death when warned of it by policy).

Defendants attempt to argue that their prone restraint of Mr. West was reasonable in duration because they allegedly ceased restraining him in a prone position immediately after the sedative drugs had taken effect. But that is merely Defendants' contention. Plaintiff alleges that Defendants continued restraining Mr. West in a prone position long enough for the sedatives to take effect, and that, at some later time, Captain Ditmore returned and saw that Mr. West was calm. *Id.*, ¶¶ 50-51. There is no allegation as to how long it took the medications to render Mr. West calm; nor is there any support for Defendants' contention that it was reasonable to restrain Mr. West in a prone position for that amount of time.[2] The

---

[2]     According to the FDA, onset of intramuscular Versed takes 15 minutes. *See* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/208878Orig1s000lbl.pdf, p. 4 ("Onset time of sedative effects after IM administration in adults is 15 minutes, with peak sedation occurring 30 to 60 minutes following injection."). A 2021 study published in the Annals of Emergency Medicine found a similar onset time of 14.7 minutes for the Versed/Haldol combination used here. *See* https://www.annemergmed.com/article/S0196-0644(21)00433-9/fulltext ("median

subsequent interval between the onset of sedation and Captain Ditmore's return also is not given in the pleadings. Only after Ditmore returned did he order the handcuffs replaced with soft restraints; and there is no allegation that Defendants immediately took Mr. West out of the prone position, even then. *Id.*, ¶ 52. Thus, it cannot simply be presumed, at the pleading stage, that Defendants' prone restraint of Mr. West was reasonable in duration. *See Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021) (denying qualified immunity to officers who applied prone restraint for nearly 15 minutes to an arrestee with excited delirium).

As to Plaintiff's claim for failure to intervene, the DCFR Defendants' only argument is that this claim cannot subsist if there is qualified immunity as to the underlying claim for excessive force. Because qualified immunity does not exist for that claim, however, as demonstrated above, Defendants' argument fails.

## 2.   Deliberate indifference to serious medical needs

The Amended Complaint alleges that Defendants Ditmore and Payne knew that Mr. West was suffering from medical symptoms associated with an increased risk of cardiorespiratory arrest; that they knew they had administered sedative drugs to Mr. West which would increase that risk; and that they knew Mr. West had a medical need for on-scene preventive measures such as repositioning his

---

time to sedation [of patients with severe psychomotor agitation] was 14.7 minutes for [5mg] midazolam [*i.e.*, Versed] and [5mg] haloperidol [*i.e.*, Haldol]"). Famously, the fatal prone restraint of George Floyd lasted less than 10 minutes.

body in order to facilitate breathing; but that they knowingly failed to take those preventive measures, resulting in his death. These allegations state a claim for deliberate indifference to serious medical needs.

Defendants attempt to suggest that a claim for deliberate indifference to serious medical needs will lie only where the victim is already incarcerated when the medical need arises; but that suggestion is contrary to precedent. *See Wade v. Daniels*, 36 F.4th 1318, 1335, 29 Fla. L. Weekly Fed. C 1247 (11th Cir. 2022) ("The Fourteenth Amendment requires government officials to provide medical care to individuals who are injured during arrest."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) (holding that, with regard to deliberate indifference to serious medical needs, "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees"); *Valderrama v. Rousseau*, 780 F.3d 1108, 1120, 25 Fla. L. Weekly Fed. C 1004 (11th Cir. 2015) (holding that an arrestee could bring a claim for deliberate indifference to serious medical needs where two officers knew he had received a non-fatal gunshot wound at the scene of the arrest, but delayed calling an ambulance for three-and-a-half minutes).

Defendants Ditmore and Payne also attempt to argue that they cannot be liable because the case law did not provide a "bright-line rule" requiring them to take any steps to help ensure Mr. West could breathe. This argument fails. It is true that the Eleventh Circuit in *Wade* referred to the absence of a "bright-line rule" as

to "how long before officers must seek medical care for a suspect that has been shot." *Wade*, 36 F.4th at 1328. But the two situations are not the same. In *Wade*, the arrestee's injury had already been inflicted, and the question was how long the officers could reasonably wait before providing treatment. Here, in contrast, Plaintiff's allegation is that Ditmore and Payne administered a maximum dose of respiratory-depressant medications to Mr. West, knowing that his symptoms and history already increased his body's demand for oxygen, and that they then knowingly disregarded the patient's need for oxygen by failing to follow DCFR policy, which prohibits prone restraint. Doc. 28, ¶¶ 130-37. Unlike the post-injury treatment at issue in *Wade*, the actions needed to ensure proper restraint position could only be taken during the restraint of Mr. West. Thus, Payne and Ditmore were not faced with any uncertainty as to how long they could reasonably wait before taking action, and the "bright-line rule" analysis of *Wade* does not apply.

Defendants mistakenly rely on the Sixth Circuit's decision in *Peete v. Metro. Gov't of Nashville*, 486 F.3d 217 (2007), to argue that DCFR employees cannot violate the Fourth Amendment because they are not law-enforcement officers. Regardless of what the Sixth Circuit may have held, Defendants' contention that firefighters are outside the scope of the Fourth Amendment is clearly not the law. *See*, *e.g.*, *Michigan v. Tyler*, 436 U.S. 499, 506 (1978) (holding that the Fourth Amendment applied to firefighters investigating the cause of a fire). The Fourth

Amendment's text does not refer to modern distinctions between a police force, a fire department, an emergency medical response agency, and so forth, but merely provides that the right of the people to be free of unreasonable searches and seizures "shall not be violated." U.S. Const. Amd. IV. And the Supreme Court has held that even private individuals who jointly participate in a constitutional violation under color of state law may be liable under Section 1983. *Adickes v. SH Kress & Co.*, 398 U.S. 144 (1970). It cannot reasonably be argued that government agents, who forcibly seize a citizen in their capacity as state actors, are somehow given constitutional *carte blanche* to use unreasonable force just because their badge does not say "Police."

### III.    Conclusion

For the foregoing reasons, the DCFR Defendants' Motion to Dismiss should be denied.

Respectfully submitted this 14th day of August, 2023.

THE DAVIS BOZEMAN LAW FIRM, PC     THE MOORE LAW FIRM, PC

*/s/  Mawuli M. Davis*                       */s/ Leighton Moore*
Robert O. Bozeman                      Leighton Moore
Georgia Bar No. 073561                 Georgia Bar No. 520701
Mawuli M. Davis                        1819 Peachtree Street, NE, Suite
Georgia Bar No. 212029                 403
4153 C. Flat Shoals Parkway, Suite 332 Atlanta, GA  30309
Decatur, GA  30034                     (404) 285-5724 (Telephone)
(404) 244-2004 (Telephone)             leighton@moorefirmpc.com
(404) 244-2020 (Facsimile)
rbozeman@davisbozemanlaw.com
mdavis@davisbozemanlaw.com             WIGGINS LAW GROUP, LLC

                                       */s/  Cary S. Wiggins*
                                       Cary S. Wiggins
                                       Georgia Bar No. 757657
                                       260 Peachtree Street, NW, Suite 401
                                       Atlanta, GA  30303
                                       (404) 659-28800 (Telephone)
                                       cary@wigginslawgroup.com

                                       *Attorneys for Plaintiff*

## **CERTIFICATE OF COMPLIANCE AND SERVICE**

The undersigned certifies that a copy of the foregoing Brief in Opposition was electronically filed with the Court using the CM/ECF System, which will automatically provide electronic service upon counsel of record for all parties.

I further certify that this document was prepared in Times New Roman, 14-point font, in compliance with this Court's Local Rule 5.1(B).

This the 14th day of August, 2023.

*/s/ Leighton Moore*
Leighton Moore