IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

YVONNE M. WEST, individually and
as Administrator of the Estate of Jamon
West,

        Plaintiff,

   v.

DEKALB COUNTY, GEORGIA, *et al.*,

        Defendants.

CIVIL ACTION

FILE NO. 1:23-CV-01907-LMM

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE MOTION TO DISMISS
OF DEKALB COUNTY AND ITS POLICE OFFICERS
M. WILLIAMS, LATTIMORE, JONES, AND PAXTON**

THE DAVIS BOZEMAN LAW FIRM, PC

Robert O. Bozeman
Georgia Bar No. 073561
Mawuli M. Davis
Georgia Bar No. 212029
4153 C. Flat Shoals Parkway, Suite 332
Decatur, GA  30034
(404) 244-2004 (Telephone)
(404) 244-2020 (Facsimile)
rbozeman@davisbozemanlaw.com
mdavis@davisbozemanlaw.com

THE MOORE LAW FIRM, PC

Leighton Moore
Georgia Bar No. 520701
1819 Peachtree Street NE, Ste. 403
Atlanta, GA 30309
(404) 285-5724 (Telephone)
leighton@moorefirmpc.com

WIGGINS LAW GROUP, LLC

Cary S. Wiggins
Georgia Bar No. 757657
260 Peachtree Street, NW, Suite 401
Atlanta, GA  30303
(404) 659-28800 (Telephone)
cary@wigginslawgroup.com

## PRELIMINARY STATEMENT

Plaintiff Yvonne M. West hereby opposes the Motion to Dismiss filed by Defendants DeKalb County and its police officers, Sgt. M. Williams, Timothy Lattimore, C. Jones, and Deion Paxton (the "DKPD Defendants").

## I.      Relevant Background

### A.      Procedural History

Plaintiff filed her Complaint in the United States District Court for the Northern District of Georgia on April 26, 2023. (Doc. 1.) On June 26, 2023, Defendants filed two Motions to Dismiss: one on behalf of Defendants DeKalb County, Jones, and Paxton (Doc. 21), and one on behalf of Defendants Ditmore and Payne (Doc. 23). In response to the first round of Motions to Dismiss, Plaintiff filed an Amended Complaint on July 17, 2023. (Doc. 28.) That filing mooted Defendants' then-pending Motions to Dismiss, as stated in this Court's Order dated July 18, 2023. (Doc. 29.)

On July 31, 2023, Defendants filed a second round of Motions to Dismiss: one on behalf of Defendants DeKalb County, C. Jones, Timothy Lattimore, Deion Paxton, and M. Williams (Doc. 41); and one on behalf of the DCFR Defendants (Doc. 43). The present Motion to Dismiss addresses Counts IV (Excessive Force), V (Deliberate Indifference to Medical Needs), VI (Failure to Intervene), and VII (Attorneys' Fees and Expenses of Litigation) of the Amended Complaint.

**B.     Factual allegations**

The lawsuit concerns an incident that occurred at Plaintiff's home in DeKalb County, Georgia. Doc. 28, ¶ 18. On August 16, 2019, Plaintiff's adult son, Jamon West, had an episode of what is known as "excited delirium" as a result of a seizure disorder. *Id.*, ¶ 19. The symptoms of excited delirium include extreme agitation, hyperactivity, hyperthermia, confusion, and disregard of pain. *Id.*, ¶ 20. Ms. West called DeKalb County 9-1-1 and reported that her son was having a seizure and that she could not control him. *Id.*, ¶¶ 21-22.

It is well known in the law-enforcement and medical communities that some methods of physical restraint create a heightened risk of asphyxia and cardiac arrhythmia in a patient with excited delirium. *Id.*, ¶ 25. Guidance from the United States Department of Justice has advised law-enforcement agencies since 1995 that this life-threatening risk is heightened when a person engages in physical struggle and then is restrained in a prone position with hands cuffed behind the back. *Id.*, ¶ 26, 66. For this reason, DCFR policy expressly prohibits prone restraint of persons with excited delirium, and permits only soft medical restraints rather than handcuffs. *Id.*, ¶ 68, 71. DKPD's policies, however, do not require modified restraint methods for persons with excited delirium. *Id.*, ¶¶ 69, 72-73.

DCFR officers Winkler and Lakatos were the first to arrive at the scene. *Id.*, ¶¶ 24. They observed the telltale symptoms of excited delirium, but they made the

initial decision to restrain Mr. West in a prone position, face down on the ground. *Id.*, ¶¶ 24, 28. Other DCFR Defendants Ditmore, Kelly, Van Wie, and Fleming arrived and assisted in restraining Mr. West in a prone position, with four or five firefighters applying force to all four extremities and to his back. *Id.*, ¶¶ 29-30.

Ms. West asked the officers to stop restraining him in this way because he could not breathe, but they ignored her. *Id.*, ¶¶ 31-33. She told all of the officers that Mr. West's abnormal behavior was the result of a medical condition for which he took prescription medications. *Id.*, ¶ 87. In addition, all of the officers could see that Mr. West exhibited classic symptoms of excited delirium: extreme agitation, hyperactivity, hyperthermia, confusion, and disregard of pain. *Id.*, ¶¶ 20, 90-91.

DCFR Defendants Ditmore and Payne gave Mr. West an intramuscular injection of the maximum permitted dose of two sedative medications, Haldol and Versed. *Id.*, ¶¶ 34-35. As Ditmore and Payne knew, both of these medications are central nervous system depressants that carry the risk of reducing a patient's ability to breathe. *Id.*, ¶¶ 37-38, 92-93, 134. Yet, after administering these medications, Defendants kept Mr. West in a prone position. *Id.*, ¶¶ 76, 134-137. When the DKPD Defendants arrived, Captain Ditmore directed them to place Mr. West in handcuffs and assisted them in cuffing his hands behind his back. *Id.*, ¶¶ 39-42. Neither he nor Defendant Payne instructed the other officers to do anything to mitigate the risk of cardiorespiratory arrest. *Id.*, ¶¶ 136-37. Ditmore left Mr. West

restrained in a prone position, face down on the ground with hands cuffed behind his back, while Ditmore walked off and made a radio call. *Id.*, ¶¶ 43-45. The officers continued to restrain Mr. West in a prone position until after the injections had taken effect and Ditmore had returned from making his call. *Id.*, ¶¶ 50-51.

Ditmore ordered the handcuffs replaced with soft restraints, and the officers began transporting Mr. West across the yard. *Id.*, ¶¶ 52-53. Mr. West's respiratory rate dropped and he went into cardiac arrest. *Id.*, ¶ 53. After spending several days in a coma, Mr. West died on August 25, 2019. *Id.*, ¶ 54. The DeKalb County Medical Examiner found that Mr. West died of "[d]elayed complications of cardiorespiratory arrest due [to] probable excited delirium and physical restraint," and that the manner of death was "homicide." *Id.*, ¶¶ 55-56.

### C.    Plaintiff's claims against the moving Defendants

Counts I and II of the Amended Complaint assert claims against DeKalb County under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12112 to 12117 (the "ADA"). Count I alleges that DeKalb County policymakers, including the Chief of Police and the Fire Chief, had actual knowledge that excited delirium is associated with an increased risk of death in custody, and that restraint procedures must be modified when a subject has excited delirium in order to avoid creating an unreasonable risk of death. Doc. 28, ¶ 62. Yet despite that knowledge, they did not require DKPD officers to use modified restraint procedures. *Id.*, ¶¶ 64-

65. Reasonable modifications adopted by other agencies include prohibiting prone restraint and behind-the-back cuffing of persons with excited delirium. *Id.*, ¶¶ 66-67, 70. DCFR policy contained these modifications, but DKPD policy did not. *Id.*, ¶¶ 68-69, 71-72, 122. DeKalb's policies also did not require officers to place a person with excited delirium in a seated or side-lying position after being cuffed, to permit proper breathing and oxygen to the heart. *Id.*, ¶ 73. This is a reasonable modification of policies and procedures that other agencies have adopted. *Id.*, ¶ 74.

Plaintiff alleges that DeKalb's failure to adopt reasonable modifications of policies and procedures to address the known risk of death from improper restraint constitutes deliberate indifference to the rights of persons, such as Mr. West, who have disabilities that cause excited delirium. *Id.*, ¶¶ 80-81. DeKalb's failure to modify its policies and procedures caused Mr. West to be improperly restrained and die, and also deprived him of the equal benefit of public mental-health and emergency services on the basis of his disability. *Id.*, ¶¶ 75-81.

Count II contains an ADA claim against DeKalb County based on the deliberate indifference of DeKalb's officers to Mr. West's need for reasonable accommodations for his disability at the scene. *Id.*, ¶¶ 83-104. In particular, Count II alleges that Captain Ditmore was vested with authority and complete discretion to make decisions on DeKalb County's behalf at the scene regarding whether to provide such accommodations, including as to the manner of Mr. West's restraint.

*Id.*, ¶¶ 84-85, 96, 101-04. Captain Ditmore knew that Mr. West was experiencing excited delirium as a symptom of a disabling medical condition. *Id.*, ¶ 86. He knew this because Ms. West told him about Mr. West's medical condition, and because he could see for himself that Mr. West exhibited all of the classic signs of excited delirium, including extreme agitation, hyperactivity, confusion, disregard of pain, elevated body temperature, and sweating. *Id.*, ¶¶ 87-91. He also knew that he had ordered Defendant Payne to give Mr. West medications that could make it more difficult for Mr. West to breathe. *Id.*, ¶¶ 92-93. Yet he did not order Mr. West's restraint modified in the ways that were necessary to prevent death in a patient with excited delirium, although he knew such modifications were needed and they were feasible. *Id.*, ¶¶ 94-100.

Count III alleges that DeKalb County's relevant policymakers, including its Chief of Police and its Fire Chief, had actual knowledge that prone restraint and behind-the-back handcuffing create an increased risk of in-custody death for subjects with excited delirium, but despite that knowledge, DeKalb failed to train its officers to avoid this known and preventable risk of death. *Id.*, ¶¶ 105-10. As a result of this lack of training, more than a dozen of DeKalb's officers either used, or stood by and failed to prevent others from using, life-threatening restraint techniques against Jamon West, causing him injury and death. *Id.*, ¶¶ 111-12.

Count IV alleges that Defendants Ditmore, Lakatos, Winkler, Kelly, Van Wie, Fleming, Lattimore, and Williams participated in the use of excessive force, in that they improperly restrained Mr. West in a prone position with his hands cuffed behind his back and with pressure on his back. *Id.*, ¶¶ 113-15. Plaintiff alleges that such restraint, under the circumstances, constituted deadly force because it created a significant risk of death or serious bodily harm. *Id.*, ¶ 116-17. Non-deadly restraint methods were safe and feasible, but Defendants failed to employ them. *Id.*, ¶¶ 118-22. Instead, they continued to apply deadly force to Mr. West after any possible justification for such force had ceased. *Id.*, ¶¶ 124-26.

Count VI addresses the fact that all of the Defendants were at the scene and witnessed the improper restraint of Mr. West, but none of them intervened to cause that restraint to be modified to permit adequate breathing. *Id.*, ¶¶ 140-44. Finally, Count VII contains a claim for attorneys' fees and expenses of litigation against the individual Defendants pursuant to 42 U.S.C. § 1988. *Id.*, ¶¶. 145-46.

## II.    Argument and Citation to Authority

Defendants throw out roughly a half-dozen arguments in an effort to find one that will shield them from liability. As demonstrated below, Defendants' Motion should be denied in full.

**A.      The applicable legal standard is stringent.**

A complaint need only contain "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a

Rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)). The Court should assume the veracity of all well-

pleaded factual allegations and then determine whether they plausibly support a

claim. *Id.* A claim is plausible when it "pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* Courts must view the complaint in the light most favorable to the

plaintiff and resolve any doubts as to its sufficiency in the plaintiff's favor.

*Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (*per curiam*).

**B.      Plaintiff does not assert separate official-capacity claims
against individual defendants under Section 1983.**

Defendants' first argument is really more a point of clarification.  They note

that a Section 1983 claim against a public official in his or her official capacity is

deemed to be equivalent to a claim against the relevant governmental entity. Doc.

43-1, pp. 6-7 (citing *Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir.

1989)). That is quite correct. To be clear, Plaintiff asserts Counts IV, V, and VI of

the Amended Complaint against the DKPD Defendants individually, and not in

their official capacities. The reason why the caption of the pleading states that the individual Defendants are sued in both their official and individual capacities is that Count II of the Amended Complaint alleges liability under the Americans with Disabilities Act for official decisions that Captain Ditmore made, and the officers under his command executed, on behalf of DeKalb County. Doc. 28, ¶¶ 83-104; *cf. Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 350 (11th Cir. 2012) (holding that a public entity may be liable under Title II of the ADA for the act of an official whom it vests with discretion to decide whether to provide an accommodation).

### C.   None of Plaintiff's claims are barred by the statute of limitations.

Because the Civil Rights Act does not provide a limitations period for claims arising under Section 1983, federal courts are directed to "borrow" an appropriate period from state law pursuant to 42 U.S.C. § 1988(a). *Wilson v. Garcia*, 471 U.S. 261, 279-280 (1985). Supreme Court precedent also dictates that the limitations period to be borrowed is "that which the State provides for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 387, 127 S. Ct. 1091, 1094, 166 L.Ed.2d 973, 980 (2007); see also *Owens v. Okure*, 488 U.S. 235, 249-250, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989); *Wilson v. Garcia*, 471 U.S. 261, 279-280 (1985). Thus, the Eleventh Circuit has held that "the proper limitations period for all section 1983 claims in Georgia is the two year period set forth in O.C.G.A. § 9-3-33 for personal injuries." *Williams v. City of Atlanta*, 794 F.2d 624, 626 (11th Cir. 1986); *see also*

9

*Johnson v. Bd. of Regents*, No. 5:06-cv-366 (WLS), 2007 U.S. Dist. LEXIS 71983, at *6 (M.D. Ga. Sep. 27, 2007) (applying two-year Georgia personal injury statute to federal disability claims under Section 504 of the Rehabilitation Act).

Along with the limitations period, federal law also borrows state law on "closely related questions of tolling and application" of that period. *Wilson*, 471 U.S. at 269; *Bd. of Regents of Univ. of N.Y. v. Tomanio*, 446 U.S. 478, 484-86, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980). District courts in Georgia have borrowed and applied the tolling rule contained in O.C.G.A. § 9-3-99. *Shaw v. Peach Cty.*, No. 5:21-cv-00145-TES, 2021 U.S. Dist. LEXIS 175088, at *17 (M.D. Ga. Sep. 15, 2021); *Benjamin v. Thomas*, No. 1:16-cv-1632-WSD, 2016 U.S. Dist. LEXIS 132575, at *18 (N.D. Ga. Sep. 27, 2016). That rule provides, in relevant part, that

> [t]he running of the period of limitations with respect to any cause of action in tort that may be brought by the victim of an alleged crime which arises out of the facts and circumstances relating to the commission of such alleged crime committed in this state shall be tolled from the date of the commission of the alleged crime or the act giving rise to such action in tort until the prosecution of such crime or act has become final or otherwise terminated, provided that such time does not exceed six years . . ..

O.C.G.A. § 9-3-99. The claims here "arise[s] out of the facts and circumstances relating to the commission of [an] alleged crime," namely an alleged homicide. Doc. 28, ¶¶ 15, 56. The DeKalb County District Attorney terminated prosecution on April 28, 2021, when she sent letters to DKPD and DCFR stating that she would not press charges. *Id.* This case was filed on April 27, 2023. *Id.*

Defendants' statute of limitations argument is based on the Georgia Court of Appeals' decision in *Hicks v. Universal Health Servs.*, 364 Ga. App. 769 (2022). The *Hicks* decision turned on the fact that a Georgia wrongful-death claim arises in favor of certain statutory beneficiaries upon the death of an injured party. As the Georgia Court of Appeals held in *Hicks*:

> [Georgia] case law is clear that despite any commonality in the damages sought, the [wrongful-death] cause of action itself belongs to the surviving parent [or other statutory beneficiary], not the victim. Therefore, the Survivor claims are not 'cause[s] of action in tort that may be brought by the victim of an alleged crime' [as required by O.C.G.A. § 9-3-99].

*Hicks*, 364 Ga. App. at 776. Following this reasoning, the court held that O.C.G.A. § 9-3-99 does not toll a Georgia wrongful-death claim because that state-law claim "is, by definition, not a claim 'that may be brought by' the decedent." *Id.*

Defendants appear to assume that *Hicks* somehow affects the tolling of limitations for claims under Section 1983 and the ADA; but Defendants provide no argument or analysis whatsoever to support that assumption or explain how they think it works. Defendants do not point to any specific counts of the Amended Complaint that they contend are barred. The most they offer is a conclusory statement in a footnote claiming that *Hicks* somehow bars Plaintiff from seeking damages for Mr. West's death. Doc. 41-1, p. 10, n. 3. But a statute of limitations defense — where it exists — bars **causes of action**, not categories of damages; and the measure of damages for Ms. West's federal claims is a question of federal law.

*Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239, 90 S. Ct. 400, 406, 24 L. Ed. 2d 386 (1969); *Gilmere v. Atlanta*, 864 F.2d 734, 739 (11th Cir. 1989).

Unlike a Georgia wrongful-death claim, Plaintiff's claims under the ADA and Section 1983 belonged to Mr. West during his lifetime. Such claims proceed from causes of action in tort "that may be brought by the victim of an alleged crime which arises out of the facts and circumstances relating to the commission of such alleged crime," within the meaning of O.C.G.A. § 9-3-99. Defendants do not identify any cause of action asserted here that Mr. West could not have brought himself, if he had lived. Nor do they contend that Mr. West's death gave rise to some new federal cause of action comparable to the state-law cause of action for wrongful death in *Hicks*. In contrast to a Georgia wrongful-death claim, the fact of Mr. West's death is not an element of any of the federal causes of action asserted in the Amended Complaint. Defendants' reliance on *Hicks* is therefore misplaced.

The Supreme Court has specifically rejected the notion that the same federal claims in the same case should be subject to two different statutes of limitations, depending on the damages sought or the capacity in which the claims are made. *Wilson*, 471 U.S. at 273-74, 105 S. Ct. at 1945-46. Instead, the Supreme Court has held that Section 1988 "is fairly construed as a directive to select, in each State, the one most appropriate statute of limitations for all § 1983 claims." *Id*., 471 U.S. at 275. Here, that is the statute for personal-injury claims. *Williams*, 794 F.2d at 626.

The fact that this Court must borrow a limitations period from state law does not somehow convert Plaintiff's federal claims into state-law claims for wrongful death. The Supreme Court has explained that the borrowing provision of Section 1988 does not "authorize the federal courts to borrow entire causes of action from state law." *Moor v. Cty. of Alameda*, 411 U.S. 693, 702 (1973) *see also Wilson*, 471 U.S. at 269 ("Congress surely did not intend to assign to state courts and legislatures a conclusive role in the formative function of defining and characterizing the essential elements of a federal cause of action."). The cause of action created by Section 1983 is a federal one, separate from any state-law remedies. *Monroe v. Pape*, 365 U.S. 167, 183 (1961).

The reason why Plaintiff has sued in both her capacity as Mr. West's mother and her capacity as the administrator of his estate is simply that Eleventh Circuit precedent gives her standing to sue in both capacities. In *Brazier v. Cherry*, 293 F.2d 401, 403-04 (5th Cir. 1961), the former Fifth Circuit held that the widow of a man beaten to death by Georgia police officers had standing to bring Section 1983 claims both as the statutory wrongful-death beneficiary under Georgia law and as administratrix of his estate. *See also Carringer v. Rodgers*, 331 F.3d 844, 847-848 (2003) (same, as to Section 1983 claims by mother of deceased son); But the Eleventh Circuit has made clear that the "incorporation of Georgia's wrongful death statute [in *Brazier*] was not done in response to a violation of the [survivor's]

13

rights: it was done to remedy the violation of the *decedent's* rights." *Robertson v. Hecksel*, 420 F.3d 1254, 1261 (11th Cir. 2005). As this Court noted in *Booker v. Anderson*, 2019 U.S. Dist. LEXIS 241687, *5-6 (Oct. 8, 2019) (May, Dist. J.), Section 1983 provides that a person who violates federal rights under color of state law "shall be liable **to the party injured.**" (emphasis added). So too here, Ms. West has filed suit to remedy violations of **Mr. West's** federal rights, for which he could have sued in his lifetime. *Hicks* is therefore inapplicable.

### D.   Plaintiff's ADA claims are legally viable.

The text of the ADA makes clear that the definition of "public entity" includes "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. 12131(1)(A) and (B). And the ADA's reference to "services, programs, or activities" of a public entity, 42 U.S.C. 12132, covers everything a public entity does. Congress expressly defined the term "[p]rogram or activity" in Section 504, which served as the model for Title II, to "mean[] all of the operations of" a covered entity. 29 U.S.C. 794(b). And Congress intended Title II of the ADA to be just as broad as Section 504. 42 U.S.C. 12201(a); *Bragdon* v. *Abbott*, 524 U.S. 624, 631-632 (1998). All "services, programs, [and] activities" therefore are covered.

The ADA's implementing regulations require that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the

modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also Southeastern Community College v. Davis*, 442 U.S. 397, 412–13 (1979) (holding that refusing to accommodate the needs of a disabled person may amount to discrimination); *Tennessee v. Lane*, 541 U.S. 509, 532, 124 S. Ct. 1978, 1994, 158 L.Ed.2d 820, 843 (2004) (holding that Title II of the ADA creates a "duty to accommodate" disabilities by making reasonable modifications).

DeKalb incorrectly states that the Eleventh Circuit has not decided whether the ADA applies to arrest and use of force by law-enforcement officers. In fact, the Eleventh Circuit resolved this question in *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1085 (11th Cir. 2007). In *Bircoll,* the Eleventh Circuit declined to decide "whether police conduct during an arrest is a program, service, or activity covered by the ADA"; but held that the plaintiff "in any event, could still attempt to show an ADA claim under the final clause in the Title II statute: that he was 'subjected to discrimination' by a public entity, the police, by reason of his disability." 480 F.3d at 1084. Thus, the holding of *Bircoll* is that the ADA **does** support a claim for disability discrimination by police officers making an arrest. *Id.*; *see also Ingram v. Kubik*, 30 F.4th 1241, 1257 (11th Cir. 2022) (stating that the contention that police cannot violate Title II "may conflict with precedent"; citing *Bircoll*).

DeKalb asks this Court to adopt the minority position of the Fifth Circuit that the ADA does not apply to arrests until the scene is secured; but the *Bircoll* court expressly considered and rejected the Fifth Circuit's reasoning. 480 F.3d at 1085. DeKalb also argues that Mr. West was not covered by the ADA because he was not voluntarily participating in a public program or service. But voluntary participation is not a criterion for an ADA claim. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998) (holding that an incarcerated person may be a "qualified individual with a disability" and that "the words [of the ADA's definition] do not connote voluntariness").

At any rate, Mr. West was not arrested for a crime, and Plaintiff's claims under the ADA do not depend primarily on the actions of DKPD officers at the scene. Count I alleges that DeKalb's policymakers failed to make reasonable modifications of policies and procedures with regard to restraint of persons who have excited delirium. Doc. 28, ¶¶ 62-64. And Count II alleges that Captain Ditmore, as the commanding officer, was deliberately indifferent to the need for a safer method of restraint. *Id.*, ¶¶ 83-104. DeKalb does not and cannot argue that DCFR employees, such as Captain Ditmore and Firefighter Payne, are outside the scope of Title II.

DeKalb mischaracterizes Count II as a claim for vicarious liability; but that is incorrect. Vicarious liability would mean holding DeKalb "liable *solely* because

it employs a tortfeasor . . ..” *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (emphasis in original). But a public entity **can** be held liable under the ADA for the decisions of an official whom it vests with supervisory authority and discretion to provide the needed accommodation. *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 349 (11th Cir. 2012); *J.S. v. Hous. Cty. Bd. of Educ.*, 877 F.3d 979, 989 (11th Cir. 2017); *Sunderland v. Bethesda Hosp., Inc*., 686 F. App'x 807, 816 (11th Cir. 2017). Here, Count II seeks to hold DeKalb liable for Captain Ditmore's decisions regarding on-scene accommodations for Mr. West's disability, because DeKalb vested Captain Ditmore with authority to make those decisions on DeKalb's behalf. As commanding officer at the scene, he had at least as much supervisory authority as a doctor in a hospital, *see Liese*, 701 F.3d at 350, or a teacher in a school, *see J.S.*, 877 F.3d at 989. That is legally sufficient.

Finally, DeKalb argues that it was not required to accommodate Mr. West's disability because "imposing a blanket-ban on prone restraints for those who present a safety concern to officers and others, at least until the person is secured and no longer a threat, is per se unreasonable." But the Amended Complaint does not allege that Mr. West was a "threat" to anyone. Quite the opposite: Plaintiff alleges that the necessary accommodations would not have posed a safety risk to the officers or anyone else. Doc. 28, ¶¶ 120-21. Nor do Plaintiff's allegations imply a "blanket ban" on prone restraints in all circumstances. Indeed, Plaintiff alleges

that **DCFR's own policy** banned prone restraint under the circumstances here. *Id.*,

¶ 68. DeKalb cannot argue that it would have been inherently unreasonable to do

as DCFR policy required. Nor is it unreasonable *per se* for Plaintiff to allege that

Defendants were required to do as the 1995 DOJ guidance advises, and place Mr.

West on his side or in a sitting position after he was cuffed. Defendant's argument

is contrary to the allegations, which must be construed in Plaintiff's favor.

> ### E.   Defendants are not entitled to qualified immunity against Plaintiff's claims for excessive force and failure to intervene.

Plaintiff's claim for excessive force is based on her allegations that the use

of prone restraint in combination with behind-the-back handcuffing, under the

circumstances, was excessive and constituted deadly force, in that the officers

knew that it exposed Jamon West to a substantial risk of death or serious bodily

injury. Doc. 28, ¶¶ 116-17. *See Pruitt v. City of Montgomery, Ala.*, 771 F.2d 1475,

1479 n.10 (11th Cir. 1985) (defining deadly force as force that an officer "knows

to create a substantial risk of causing death or serious bodily harm"); *Bradley v.

Benton*, 10 F.4th 1232, 1241 (11th Cir. 2021) (noting that even "a foot, or a fist"

may be used to apply deadly force, depending on the circumstances). Plaintiff

alleges that there was no need for these potentially deadly methods of restraint, that

other, safer means were feasible and would not have involved any significant risk

to the officers or anyone else; and that Defendants continued to apply these

potentially deadly methods of restraint after any possible justification for them had ceased. Doc. 28, ¶¶ 119-121, 124.

Plaintiff further alleges that Mr. West had a clearly established right to be free from deadly force because he was known to be unarmed; was not suspected of any crime; was not attempting to flee; and was capable of being restrained safely without the need to cuff him behind the back and hold him in a prone position. *Id.*, ¶ 126. There is also no allegation that Mr. West ever attacked or threatened the officers. "Because this situation was clearly not a deadly force situation, and because the officers utilized deadly force to subdue [Mr. West], they violated the clearly established principle that deadly force cannot be used in non-deadly situations." *Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005).

Defendants appear to argue that prone restraint is reasonable as a matter of law whenever a detainee struggles with officers. But the Supreme Court expressly rejected that argument in its 2021 decision in *Lombardo* v. *City of St. Louis*, 141 S. Ct. 2239 (2021). The Court cannot decide the issue "mechanically," as Defendants would ask, but must pay "careful attention to the facts and circumstances of each particular case." *Lombardo*, 141 S. Ct. at 2241 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), and *Graham* v. *Connor*,  490 U.S. 386, 397 (1989)). As outlined in *Lombardo*, relevant facts and circumstances may include the failure to follow departmental policies designed to mitigate the risk of death from prone

restraint, as well as "well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of that risk." *Id.*, 141 S. Ct. at 2241, 210 L.Ed.2d at 612. The Eleventh Circuit has relied on *Lombardo* for the rule that, "when deciding whether to grant summary judgment on an excessive force claim, relevant facts include departmental instructions and other well-known police guidance." *Bradley*, 10 F.4th at 1241.

Plaintiff's Amended Complaint specifically alleges "well-known police guidance" of the kind cited in *Lombardo* and *Bradley*. *See* Doc. 28, ¶ 26 (alleging specific, decades-old guidance to law-enforcement agencies from the United States Department of Justice); ¶ 66 ("It is well known that prone restraint of persons with excited delirium creates an increased risk of positional asphyxia and cardiac arrythmia, especially when the subject's hands are cuffed behind the back."). Under *Lombardo* and *Bradley*, these allegations create a reasonable inference that the law-enforcement officers involved in Mr. West's restraint were aware that they were subjecting him to an unreasonable risk of death.

The Supreme Court's direction to pay "careful attention to the facts and circumstances of each particular case" — particularly including applicable policies and well-known police guidance, *Lombardo*, 141 S. Ct. at 2241, 210 L.Ed.2d at 612 — renders inapposite the older cases relied upon by Defendants. For example, the Eleventh Circuit's *per curiam* decision in *Garrett v. Athens-Clarke Cty.*, 378

F.3d 1274, 1280 (11th Cir. 2004), involved an incident that occurred in 1997. The case came up on summary judgment, which the Eleventh Circuit granted because the plaintiff had not offered medical expert testimony that the method of restraint at issue in fact posed a significant risk of death. 378 F.3d at 1280. The Court also noted that "the officers tried to restrain [the decedent] in a less restrictive manner (simple handcuffing), but [he] ran and fought with the police and kept on violently kicking and resisting." *Id.* In contrast, Plaintiff alleges that non-deadly restraint methods were feasible but were not used. Doc. 28, ¶¶ 119-22; *see Helm v. Rainbow City*, 989 F.3d 1265, 1275 (11th Cir. 2021) (force is excessive where a reasonable officer would find the level of force used unnecessary in the circumstances).

The Eleventh Circuit's 1996 decision in *Cottrell v. Caldwell*, 85 F.3d 1480 (11th Cir. 1996), involved police conduct that occurred in 1990, a full five years before the 1995 Department of Justice guidance was issued. 85 F.3d 1480, 1488; *cf.* Doc. 28, ¶ 26 (describing the 1995 DOJ guidance). The plaintiff in *Cottrell* provided an expert affidavit stating that "'it was well known by police on the day of Mr. Wilson's death improper restraint of arrested persons, particularly those on medication and/or who have engaged in strenuous activity, could quickly cause death by asphyxiation'"; but there were no facts to show that the officers involved actually possessed this knowledge. 85 F.3d 1480, 1491.

The facts are different here. At the time of the 2019 incident involving Mr. West, the 1995 DOJ guidance had been in force for nearly a quarter of a century, and DeKalb County and other jurisdictions had incorporated it into specific policies prohibiting the conduct alleged here. In that context, it cannot be assumed at the pleading stage that DeKalb County's officers were ignorant of the well-publicized risks of prone restraint. Further, the fact that DCFR had a written policy expressly forbidding prone restraint of a subject with excited delirium in order to reduce the risk of death, Doc. 28, ¶¶ 67-68, at least raises the inference that Defendants knew such restraint would create a heightened risk of death. *Benton*, 10 F.4th 1232, 1241 (policy may create a jury issue as to officer's knowledge of risk).

Defendants attempt to argue that the prone restraint of Mr. West was reasonable in duration because they allegedly ceased restraining him in a prone position immediately after the sedative drugs had taken effect.[1] But that is merely Defendants' contention. Plaintiff alleges that Defendants continued restraining Mr.

---

[1]    According to the FDA, onset of intramuscular Versed takes 15 minutes. *See* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/208878Orig1s000lbl.pdf, p. 4 ("Onset time of sedative effects after IM administration in adults is 15 minutes, with peak sedation occurring 30 to 60 minutes following injection."). A 2021 study published in the Annals of Emergency Medicine found a similar onset time of 14.7 minutes for the Versed/Haldol combination used here. *See* https://www.annemergmed.com/article/S0196-0644(21)00433-9/fulltext  ("median time to sedation [of patients with severe psychomotor agitation] was 14.7 minutes for [5mg] midazolam [*i.e.*, Versed] and [5mg] haloperidol [*i.e.*, Haldol]"). Famously, the fatal prone restraint of George Floyd lasted less than 10 minutes.

West in a prone position long enough for the sedatives to take effect, and that, at some later time, Captain Ditmore returned and saw that Mr. West was calm. *Id.*, ¶¶ 50-51. There is no allegation as to how long it took the medications to render Mr. West calm; nor is there any support for Defendants' contention that it was reasonable to restrain Mr. West in a prone position for that amount of time. The subsequent interval between the onset of sedation and Captain Ditmore's return also is not given in the pleadings. Only after Ditmore returned did he order the handcuffs replaced with soft restraints; and there is no allegation that Defendants immediately took Mr. West out of the prone position, even then. *Id.*, ¶ 52. Thus, it cannot simply be presumed, at the pleading stage, that Defendants' prone restraint of Mr. West was reasonable in duration. *See Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021) (denying qualified immunity to officers who applied prone restraint for nearly 15 minutes to an arrestee with excited delirium).

Defendants argue that the claim for failure to intervene cannot subsist if there is qualified immunity as to the underlying claim for excessive force. As demonstrated above, however, there is **not** qualified immunity for that claim. The claim for failure to intervene lies against "[a]ll of the individual Defendants." Doc. 28, ¶ 140. Because Sergeant M. Williams is one of the individual Defendants, Defendants' contention that there are no allegations against him is incorrect. Doc. 41-1, pp. 3, 10-11. Plaintiff alleges that Sergeant M. Williams, like the other

individual Defendants, was present at the incident scene and observed the life-threatening use of force by the Excessive Force Defendants, but failed to intervene to prevent them from improperly restraining Mr. West. Doc. 28, ¶¶ 140-44.[2]

### F.   Plaintiff states a *Monell* claim against DeKalb County for deliberate indifference to the need for training.

DeKalb contends that its officers could not have been expected to know that prone restraint of a person with excited delirium posed a significant risk of death. Plaintiff plausibly alleges, however, that DeKalb County policymakers actually had such knowledge. Doc. 28, ¶¶ 62-63. The 1995 DOJ guidance has been in place for more than two decades. *Id.*, ¶ 26. Both DCFR and DKPD have adopted written policies regarding excited delirium, and DCFR's manual expressly forbids prone restraint of persons with excited delirium. *Id.*, ¶¶ 63, 65, 68, 71.

If Plaintiff's allegations are correct that DeKalb's policymakers actually knew that prone restraint posed a significant risk of death when used on a person with excited delirium, and if DeKalb is correct that its officers cannot be expected to know this information, then a jury could find there was an obvious need for training. *See Connick v. Thompson*, 563 U.S. 51, 52 (2011) (need for training is obvious where officers "are unlikely to be familiar with constitutional constraints on deadly force and, absent training, cannot obtain that knowledge").

---

[2]   To the extent that Sgt. Williams seeks more specific allegations, the proper course is a motion for more definite statement, not a motion to dismiss. *Weiland v.*

The fact that DeKalb's policymakers had actual knowledge of a heightened risk of death from prone restraint in these particular circumstances distinguishes this case from *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009), in which the Eleventh Circuit held that the deficiencies of a police department's training program as to the use of a hobble restraint were not so obvious as to support liability for deliberate indifference. There was no evidence in *Lewis* that the municipality's policymakers had actual knowledge that the hobble restraint should be prohibited in certain circumstances to avoid a significant risk of death, but still failed to train officers regarding that risk. Here, Plaintiff alleges such knowledge. Doc. 28, ¶¶ 62-71. The present case more closely resembles *Valenzuela v. City of Anaheim*, No. SACV 17-00278-CJC, 2019 U.S. Dist. LEXIS 129976, at *33 (C.D. Cal. Feb. 12, 2019), in which the court upheld a *Monell* claim where the police department had actual knowledge, as reflected in its policies, that a carotid hold posed a significant risk of death, but still permitted its officers to use the hold. The circumstantial evidence of knowledge that would be provided by prior incidents is not necessary where, as here, DeKalb's written policies provide direct evidence that policymakers were aware of the relevant risk.

### III.   Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

---

*Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321 n.10 (11th Cir. 2015).

Respectfully submitted this 14th day of August, 2023.

THE DAVIS BOZEMAN LAW FIRM, PC          THE MOORE LAW FIRM, PC

*/s/  Mawuli M. Davis*          */s/ Leighton Moore*
Robert O. Bozeman                                  Leighton Moore
Georgia Bar No. 073561                         Georgia Bar No. 520701
Mawuli M. Davis                                      1819 Peachtree Street, NE, Suite
Georgia Bar No. 212029                         403
4153 C. Flat Shoals Parkway, Suite 332   Atlanta, GA  30309
Decatur, GA  30034                               (404) 285-5724 (Telephone)
(404) 244-2004 (Telephone)                  leighton@moorefirmpc.com
(404) 244-2020 (Facsimile)
rbozeman@davisbozemanlaw.com
mdavis@davisbozemanlaw.com                WIGGINS LAW GROUP, LLC

                                                           */s/  Cary S. Wiggins*
                                                           Cary S. Wiggins
                                                           Georgia Bar No. 757657
                                                           260 Peachtree Street, NW, Suite 401
                                                           Atlanta, GA  30303
                                                           (404) 659-28800 (Telephone)
                                                           cary@wigginslawgroup.com

                                                           *Attorneys for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

The undersigned certifies that a copy of the foregoing Brief in Opposition was electronically filed with the Court using the CM/ECF System, which will automatically provide electronic service upon counsel of record for all parties.

I further certify that this document was prepared in Times New Roman, 14-point font, in compliance with this Court's Local Rule 5.1(B).

This the 14th day of August, 2023.

*/s/ Leighton Moore*
Leighton Moore